**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| SOCIETE GENERALE, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 03-2071 (WHW) |
| | : | |
| NEW JERSEY TURNPIKE AUTHORITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**Walls, District Judge**

Defendant New Jersey Turnpike Authority ("NJTA") moves for summary judgment. The motion is decided without oral argument pursuant to Fed. R. Civ. P. 78.

### FACTS AND PROCEDURAL BACKGROUND

The undisputed facts are:  In 2000, NJTA issued Turnpike Revenue Bonds in an amount in excess of $1.8 billion to finance NJTA's various construction projects, among other purposes. These bonds were known as the Series 2000 A and Series 2000 B-G bonds. The Series 2000 A bonds, which generated proceeds in excess of $1.4 billion, paid a fixed rate of interest of approximately 5.4% to those who purchased them. The Series B–G bonds, which generated proceeds of approximately $400 million, paid interest at a variable rate.

The preparation for the bond issue began in March 1999.  As part of planning for the bond issue, NJTA determined that 11 capital projects would be funded, in whole or in part, with bond proceeds.  HNTB, NJTA's general engineering consultant, calculated an anticipated draw schedule that would later be used by potential investors bidding on repurchase agreements in

**NOT FOR PUBLICATION**

connection with the bond issue.[1]  The schedule was calculated by estimating quarterly

expenditures for each capital project involved in the bond issue, using construction scheduling

software which produces a project schedule and projects the costs of completing the components

of that schedule.  After HNTB completed the draw schedules, they were sent to Solomon Smith

Barney, the managing underwriter for the bond issue, for their review. Solomon Smith Barney

used the draw schedules to size the transaction and to produce schedules for tax counsel so that

tax counsel could determine whether the draw schedules were compliant with IRS guidelines.

       One of the construction projects to be funded with the bond issue proceeds was Route 92,

a proposed highway extending from turnpike interchange 8A to Route 1.  NJTA had been

attempting to build this road since the early 1990s.  In January 1997, the U.S. Environmental

Protection Agency (the "EPA") announced that it was opposed to Route 92 and that it would

deny NJTA's application for the freshwater wetlands individual permit that NJTA was required

to obtain before beginning construction. The EPA reiterated its opposition to Route 92 in

September 1998. Thereafter, jurisdiction over the permitting process passed to the U.S. Army

Corps of Engineers (the "ACOE").  Although ACOE would be the agency to rule on any permit

application, NJTA understood that the EPA could veto the Route 92 project even if ACOE

approved the permit.  In February 2000, ACOE declined to issue the permit, opting instead to

---

[1] A repurchase agreement is effectuated when an institution with money to invest "purchases" collateral securities from a bank.  The buyer's trustee typically holds the securities. Over time, the buyer sells the collateral securities back to the bank for an amount equal to the value of the securities, plus a designated rate of interest.  Each "repurchase" of securities by the bank is known as a "drawdown" of the monies that the buyer has invested with the bank.

**NOT FOR PUBLICATION**

require the preparation of an environmental impact statement ("EIS") before deciding whether to grant NJTA's permit application. NJTA considered this development "[p]ossibly a setback, possibly just a further delay."

NJTA prepared the draw schedule following the announcement by ACOE that it would require the preparation of an EIS.  ACOE had advised that the EIS for Route 92 could be completed within six months of February 2000.  In calculating the draw schedule, however, NJTA estimated that it would be fifteen months before construction began on Route 92.  In other words, NJTA estimated that construction would not begin until April 2001.  In November 1999, NJTA prepared a document titled "Back-Up Plans for $300 Million Designated for Route 92 If That Project Does Not Receive ACOE Permit," which set forth two plans identifying construction projects that NJTA could have funded with the money allocated to Route 92.

NJTA sought to invest proceeds from the bond issue with investment providers.  On March 31, 2000, NJTA, through its bidding agent, Public Financial Management, Inc.("PFM"), sent a letter to various potential investment providers, including plaintiff Societe Generale ("SG"). The bid letter announced that NJTA was seeking bids for the investment of proceeds of the Series 2000 A bonds in two investment vehicles known as "repurchase agreements."  The repurchase agreements were designed to allow NJTA first to deposit funds with the investment provider, and then to withdraw principal and receive a fixed rate of interest on the deposited principal over the life of the repurchase agreement.  The bid letter advised potential bidders that "[p]articipation by any provider in this bidding process does not constitute the basis for any

**NOT FOR PUBLICATION**

contract between the Issuer and that firm.  Contracts for investment agreement services shall only be in force and effect upon execution of a legally binding and valid agreement."  (Bid Letter.)

Attached to the bid letter were the bid specifications.  The bid specifications provided that "[t]he terms of the Agreements are expected to be as set forth in these specifications and in the attached form of Annex to the BMA master repurchase agreement." (Bid Specs. at ¶ 3.)  The bid specifications further advised potential bidders that NJTA intended to invest the proceeds of the Series 2000 A bonds in two different repurchase agreements, known as Agreement #1 and Agreement #2.  The bid specifications provided that NJTA "expects to withdraw funds twice per week and will expend all funds in Agreement #1 prior to expending funds from Agreement #2." (Bid Specs. at ¶ 5.)  In addition, the bid specifications stated that Agreement #1 would terminate on January 1, 2003, and Agreement #2 would terminate on January 1, 2005.

The bid specifications also said that "[NJTA] requires full flexibility to draw funds with no limitations or restrictions as required on one (1) business day notice.  A schedule of projected withdrawals for each Agreement is attached as Exhibit A hereto." (Id.)  NJTA expressly represented that it "reasonably expected" to draw down funds consistent with the draw schedule. The inclusion of such a schedule is required by applicable Treasury regulations in order for an issuer of tax-exempt bonds, such as NJTA, to fall within the market price safe harbor for guaranteed investment contracts.  The bid specifications also informed the potential providers that the winning bidder would be required to sign a provider certificate certifying, among other things, that "[t]he determination of the price of the Investment Agreement took into consideration

-4-

**NOT FOR PUBLICATION**

as a significant factor the Authority's reasonably expected drawdown schedule for the funds."

(Bid Specs. at Ex. C.)

In addition to the bid letter and bid specifications, potential providers were furnished with a draft Annex to the BMA Master Repurchase Agreement, a draft of a form provider certificate, and a preliminary version of the Official Statement, the prospectus that was issued to potential investors to explain the bond issue.  NJTA and its bidding agent PFM intended and understood that all of the material information that a bidder required was included among the bid documents. On this point, the bid specifications advised potential bidders that their "bids should be based on the information provided in this package."  (Bid Letter.)  The bid letter also said that "[i]f you have any questions or would like more information, please call Michael Harris or Steve Wisloski," and gave their contact information  (Id.)

SG submitted the winning bid of 6.65% on Agreement #1.  Accordingly, SG and NJTA entered into the repurchase agreement about April 26, 2000 (the "Agreement").  On that same day, SG submitted to NJTA an executed provider certificate which certified that the draw schedule "as provided in the solicitation for bids, was a significant factor in determining the Provider's bid for the Repurchase Agreement."  (Prov. Cert. at ¶ 7.)  NJTA deposited approximately $307 million with SG.

According to SG's records, from May 9, 2000 to September 30, 2000, the NJTA's withdrawals of funds from it were between $969,702.65 and $10,174,289.63 more than projected in the draw schedule.  Then from October 1, 2000 through December 6, 2000, the running balance on NJTA's total withdrawals ranged in general from $8,407,394.08 and $768,822.90 less

**NOT FOR PUBLICATION**

than what they should have been based on the draw schedule. From December 7, 2000 to June 30, 2001, NJTA's withdrawals ranged between $17,392,492.04 less and $10,308,282.56 more than what was estimated in the draw schedule. Although NJTA had estimated that it would begin spending on the construction of Route 92 in April 2001, the EIS was not completed within six months as ACOE had predicted and NJTA had not received permits from ACOE by the end of April 2001. From July 1, 2001 through December 31, 2001, NJTA's withdrawals ranged between $17,415,782.06 and $64,231,353.90 less than projected. By April 2002, NJTA's withdrawals were $90 million less its projected withdrawals, and remained at least $100 million below the projected withdrawals from July 1, 2002 forward. The draft EIS on the Route 92 project was not completed and released until April 2004 and as of the date plaintiff filed its opposition brief, a permit had not yet been issued.

It is undisputed that from May 9, 2000 to December 31, 2001, no employee from SG contacted NJTA with concerns about the departures from the draw schedule. There is a dispute as to whether a SG employee tried to call the NJTA's trustee about the discrepancies in January or February of 2002. After contacting an intermediary to inquire about NJTA's draw schedule, a meeting was convened in July 2002 involving representatives from SG and the New Jersey Department of Transportation. At that meeting, SG representatives communicated their concern that NJTA was not drawing funds down consistent with the draw schedule, and they requested information regarding how NJTA intended to use the money. The representatives of the New Jersey Department of Transportation terminated the meeting thereafter. The meeting did not trigger any dialogue or exchange of information with NJTA. At some point later, an intermediary

**NOT FOR PUBLICATION**

named Andrew Sinclair acting on behalf of SG called NJTA executives regarding SG's concern

with the draw schedule.  There appears to be a dispute as to whether Sinclair informed NJTA

executives that he was calling on behalf of SG when he first contacted them.  In a letter dated

November 27, 2002, a SG employee wrote NJTA that NJTA's minimal withdrawals constituted,

in SG's view, a breach of the Agreement.  NJTA did not respond to the letter.

Because NJTA did not withdraw funds according to the draw schedule, at certain points

during the term of the Agreement, SG held more of NJTA's money than projected by the draw

schedule and paid NJTA 6.65% interest on the amounts that it held.  The interest rates on SG's

investments dropped between April 2000 and December 2002 and it was compelled to invest the

additional funds from the Agreement at interest rates below the 6.65% rate guaranteed to NJTA.

Thus, SG claims that it paid more interest to NJTA over the life of the Agreement than it had

projected based on the draw schedule.

On May 6, 2003, plaintiff SG filed a complaint against defendant NJTA stating claims for

breach of contract, breach of the implied duty of good faith and fair dealing, unjust enrichment,

promissory estoppel, breach of warranty, breach of implied warranty, and mutual mistake of fact.

Defendant has answered the complaint and discovery was taken.  Defendant now moves for

summary judgment on all claims.

<b>STANDARD FOR SUMMARY JUDGMENT</b>

Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary

-7-

NOT FOR PUBLICATION

judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. See id. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive a motion for summary judgment, a nonmovant must present more than a mere scintilla of evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

**DISCUSSION**

**I.**      **Breach of Contract**

NOT FOR PUBLICATION

In interpreting a contract, courts must look to the intent of the parties.  Biovail Corp.

Intern. v. Hoechst Aktiengesellschaft, 49 F. Supp. 2d 750, 774-75 (D.N.J. 1999).  "The search for

the intent of the parties does not require an inquiry into the subjective intent of the parties, 'but

rather centers on the intent embodied by the language that the parties chose to memorialize their

agreement.'" Id. (quoting Williams v. Metzler, 132 F.3d 937, 947 (3d Cir. 1997)).  Thus, courts

should consider the "objective intent manifested in the language of the contract in light of the

circumstances surrounding the transaction." Id. (quoting SmithKline Beecham Corp. v. Rohm

and Haas Co., 89 F.3d 154, 159 (3d Cir.1996) (citation omitted)).  When the "terms of a contract

are clear and unambiguous there is no room for interpretation or construction and the courts must

enforce those terms as written." City of Orange Tp. v. Empire Mortg. Services, Inc., 775 A.2d

174, 179 (N.J.Super.A.D. 2001) (citing Kampf v. Franklin Life Ins. Co., 161 A.2d 717 (N.J.

1960); Levison v.Weintraub, 521 A.2d 909 (N.J Sup.Ct.App.Div.), certif. denied, 107 N.J. 650,

527 A.2d 470 (1987)).  Whether a contract provision or term is clear or ambiguous is a question

of law and therefore suitable for a decision on a motion for summary judgment.  Driscoll Const.

Co., Inc. v. State, Dept. of Transportation, 853 A.2d 270, 276 (N.J.Super.A.D. 2004).

An ambiguity exists if "'the terms of the contract are susceptible to at least two

reasonable alternative interpretations.'" Cooper River Plaza East, LLC v. Briad Group, 820 A.2d

690, 697 (N.J.Super.A.D. 2003) (quoting Kaufman v. Provident Life and Cas. Ins. Co., 828 F.

Supp. 275, 283 (D.N.J. 1992)).  To determine whether an ambiguity exists, the court must

consider "the contract language, the meanings suggested by counsel, and the extrinsic evidence

offered in support of each interpretation." Biovail, 49 F. Supp. 2d  at 774-75 (quoting Teamsters

NOT FOR PUBLICATION

Industrial Emp. Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135  (3d Cir. 1993)). "Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." Id. Furthermore, under canons of construction, words of an agreement are given their ordinary meaning.  Flanigan v. Munson, 818 A.2d 1275, 1280 (N.J. 2003) (citation omitted). If a term or provision is ambiguous, it is a question of fact for the factfinder.  Biovail, 49 F. Supp. 2d  at 774-75.  "The court should examine the document as a whole and the 'court should not torture the language of [a contract] to create ambiguity.'"  Schor v. FMS Financial Corp.,  814 A.2d 1108, 1112 (N.J.Super.A.D. 2002) (citing Nester v. O'Donnell, 693 A.2d 1214 (N.J.Super.A.D. 1997) (quoting Stiefel v. Bayly, Martin & Fay, Inc., 577 A.2d 1303 (N.J.Super.A.D.1990))).  "Contract provisions are to be interpreted so as to give each provision meaning, rather than rendering some provisions superfluous." Carter v. Exxon Co. USA, 177 F.3d 197, 206 (3d Cir. 1999).

Defendant argues that it is entitled to summary judgment on plaintiff's breach of contract claim because the terms of the Agreement are unambiguous.  The relevant provision in the Agreement over which the parties disagree is language in Annex I which says that "[p]rior to the Final Repurchase Date, [SG] shall repurchase all or part of the Purchased Securities in such amounts as [NJTA] shall request by notice to [SG] at least one (1) Business Day prior to the date of the Repurchase Transaction."  (Annex I at p.9.)  Defendant contends that this language does not obligate it to make withdrawals pursuant to the draw schedule attached to the bid specifications.  Plaintiff, on the other hand, argues that this provision should be interpreted in light of the draw schedule such that defendant was not free to disregard the draw schedule after

NOT FOR PUBLICATION

the Agreement was executed.  In essence, the parties disagree over the meaning of "full

flexibility" as that term was used in the bid specifications to refer to what types of agreements

defendant was soliciting bids for.  Defendant argues the meaning is unambiguous whereas

plaintiff claims that it is ambiguous and cannot be resolved without being submitted to the

factfinder.

In support of its position, defendant relies on the language itself, which makes no

reference to the draw schedule or in any way limits the manner in which defendant could make

withdrawals except that notice had to be given at least one business day in advance.  Defendant

also points out that the draw schedule is not referenced anywhere in the Agreement.  According

to defendant, "full flexibility" means that defendant could draw down the funds in whatever

amount it desired at any time it desired so long as it gave the required one day notice to plaintiff.

Defendant argues that this interpretation gives meaning to all the words in the provision, unlike

plaintiff's interpretation.  It appears that plaintiff reads "full flexibility" to mean only that

defendant had the right to withdraw funds on one day's notice; not the right not to withdraw

funds at all.  Plaintiff relies on two provisions of the bid specifications to support its position.

First, it points to the provision which reads:  "[NJTA] requires full flexibility to draw funds with

no limitations or restrictions as required on one (1) business day notice.  A schedule of projected

withdrawals for each Agreement is attached as Exhibit A hereto. [NJTA] expects to withdraw

funds twice per week and will expend all funds in Agreement #1 prior to expending funds from

Agreement #2."  (Bid Specs. at ¶ 5.)  Second, plaintiff notes that the bid specifications provided

that "[t]he terms of the Agreements are expected to be as set forth in these specifications and in

NOT FOR PUBLICATION

the attached form of Annex to the BMA Master Repurchase Agreement." (Id. at ¶ 3.)  Plaintiff

also relies on deposition testimony from two of its own employees and the report of a third-party

investment advisor regarding the meaning of "full flexibility."  Additionally, plaintiff points out

that it executed the provider certificate, which it was required to do by defendant, in which it

certified that "[t]he expected payment and delivery schedule of amounts to be invested pursuant

to the Repurchase Agreement, as provided in the solicitation for bids, was a significant factor in

determining the Provider's bid for the Repurchase Agreement."  (Prov. Cert. at ¶ 7.)

　　　　Upon consideration of the Agreement's language, the interpretations offered by the

parties, and their extrinsic evidence in support thereof, the Court finds that the Agreement is

ambiguous because it is susceptible to at least two reasonable alternative interpretations.  In light

of the surrounding circumstances, the Agreement is ambiguous on whether defendant was free to

not withdraw funds or to draw funds in amounts vastly different from those in the draw schedule.

Because the Agreement is ambiguous and must be decided by the factfinder, defendant's motion

for summary judgment on the breach of contract claim is denied.

**II.**　　**Implied Covenant of Good Faith and Fair Dealing**

　　　　Plaintiff's second claim against defendant is for breach of the implied covenant of good

faith and fair dealing.  In the Complaint, plaintiff alleges that the covenant was breached by

defendant's failure to withdraw the deposited funds reasonably in accordance with the draw

schedule.

　　　　"[I]n every contract there is an implied covenant that neither party shall do anything

which will have the effect of destroying or injuring the right of the other party to receive the

NOT FOR PUBLICATION

fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing."  Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997) (quoting Palisades Properties, Inc. v. Brunetti, 207 A.2d 522 (N.J. 1965)).  The covenant has been applied in three general ways: First, the covenant permits the inclusion of terms and conditions which have not been expressly set forth in the written contract but "the parties must have intended . . .  because they are necessary to give business efficacy" to the contract. Seidenberg v. Summit Bank, 791 A.2d 1068, 1076 (N.J.Super.A.D. 2002).  "Second, the covenant has been utilized to allow redress for the bad faith performance of an agreement even when the defendant has not breached any express term, as in Sons of Thunder."  Id.  Third, the covenant has been held to permit inquiry into a party's exercise of discretion that was expressly granted by a contract's terms. Id.  This third situation was addressed by the New Jersey Supreme Court in Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1130 (N.J. 2001).  There the issue was whether the implied covenant of good faith and fair dealing could be breached by a party by setting gasoline prices notwithstanding a contract provision that gave the party full authority to set such prices.  The court announced the following test:

> [A] party exercising its right to use discretion in setting price under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract. Such risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial. They do not reasonably intend that one party would use the powers bestowed on it to destroy unilaterally the other's expectations without legitimate purpose. At the same time, the test must recognize the mutuality of expectation and enforce a party's contractual right to exercise discretion in setting prices based on its own reasonable beliefs concerning business strategy. In that setting, an allegation of bad faith or unfair dealing

NOT FOR PUBLICATION

> should not be permitted to be advanced in the abstract and absent improper
> motive. Without bad motive or intention, discretionary decisions that happen to
> result in economic disadvantage to the other party are of no legal significance.

Id. (internal citations omitted).

Plaintiff argues that all three of the situations described in Seidenberg are implicated here.

Defendant, on the other hand, contends that there is no evidence of improper motive on its part in

not withdrawing funds in accordance with the draw schedule.  Defendant further claims that its

exercise of discretion in withdrawing funds in different amounts from those represented on the

draw schedule was a normal business risk that plaintiff should have contemplated when the

contract was formed.

As the Court sees it, the situation here most closely resembles that in Wilson in that it

appears defendant retained at least some amount of discretion regarding the amounts (since the

draw schedule was only a projected schedule) and timing of funds to be withdrawn.  Thus, under

Wilson, the next inquiry is whether plaintiff has evidence of improper motive to support its

claim.  Plaintiff claims that it has evidence that defendant knew but did not disclose to plaintiff

that there was a substantial risk that it would not spend the funds on the Route 92 project during

the term of the Agreement, thus making the projected draw schedule unreasonable.  There is

defendant personnel's deposition and the handwritten notes of one of defendant's employees

from a meeting on August 17, 1999 that defendant knew before entering into the Agreement that

the EPA opposed the Route 92 project, that the EPA could veto the project, and that a

representative from ACOE had said that he would not be surprised if the EPA used its veto

power.  Also, there is evidence that of those persons who prepared the draw schedule, no one

NOT FOR PUBLICATION

thought the six-month time frame for the EIS was feasible.  There is evidence that defendant

knew that a number of townships were opposed to the Route 92 project.  Fourth, plaintiff relies

on a memorandum dated April 18, 2000, before plaintiff and defendant executed the Agreement

on April 26, 2000, briefing NJTA's executive director on the status of the ACOE EIS.  That

memorandum expresses the chief engineer's concern about the ACOE's lack of progress on the

EIS and says that "the federal EIS process hasn't even gotten started."  (Kunna Memo, April 18,

2000.)  Fifth, there is evidence that defendant did not want potential bidders looking for

information about the repurchase agreements outside of what was in the documents provided to

them. In addition, plaintiff argues that defendant's unilateral decision to expend $70 million in

pre-existing assets on construction expenses rather than making withdrawals from the funds on

deposit with SG as projected to cover such expenses supports its claim for breach of the implied

covenant of good faith and fair dealing.

        While it may be an uphill battle for plaintiff to convince a jury that defendant acted with

an improper motive, plaintiff has produced more than a "mere scintilla" of evidence to defeat

defendant's motion for summary judgment on this claim.  Accordingly, defendant's motion for

summary judgment on this claim is denied.

### III.    Unjust Enrichment

        Plaintiff's Third Count is for unjust enrichment.  Plaintiff alleges that NJTA's retention

of benefits it received under the Agreement "in excess of the benefits intended by the Repurchase

Agreement constitutes unjust enrichment."  (Compl. at ¶ 35.)   "To establish unjust enrichment, a

plaintiff must show both that defendant received a benefit and that retention of that benefit

NOT FOR PUBLICATION

without payment would be unjust." <u>VRG Corp. v. GKN Realty Corp.</u>, 641 A.2d 519, 526 (N.J. 1994). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." <u>Id.</u>

Defendant argues that plaintiff's claim must fail because NJTA's actions were expressly authorized by the Agreement. In light of this Court's earlier conclusion that the Agreement is ambiguous, however, whether NJTA's actions were pursuant to a contractual right remains to be seen. Defendant also claims that plaintiff cannot say that it expected remuneration from it because plaintiff was obligated to pay defendant a fixed rate of return of 6.65% and defendant received no more than that. As noted in the statement of facts, however, plaintiff claims that it paid defendant more interest over the life of the Agreement than it anticipated it would based on the projected draw schedule. According to plaintiff, defendant received an additional $10 million in interest because of its failure to withdraw funds according to the schedule. There also appears to be a dispute over whether NJTA gained a windfall as a result of the additional interest because defendant claims those amounts will be rebated to the federal government. Given the existence of these material disputes, defendant's motion for summary judgment on this claim is also denied.

**IV.   Promissory Estoppel**

Plaintiff's Fourth Count alleges that "NJTA's conduct and SG's reliance thereon estop NJTA from asserting that it is not bound by the Draw Schedule." (Compl. at ¶ 37.) Four elements must be established for promissory estoppel to apply: "1) there is a clear and definite

-16-

NOT FOR PUBLICATION

promise by the promisor; 2) the promise was made with the expectation that the promisee will

rely on it; 3) the promisee must in fact reasonably rely on the promise; and 4) detriment of a

definite and substantial nature must be incurred in reliance on the promise." R.J. Longo Const.

Co., Inc. v. Transit America, Inc., 921 F. Supp. 1295, 1305 (D.N.J. 1996) (citing Royal

Associates v. Concannon, 490 A.2d 357 (N.J.Super.A.D.1985)).

 Defendant argues that because there is an enforceable contract between it and plaintiff, a

claim for promissory estoppel cannot be maintained.  There are two flaws in this argument.  The

case defendant advances to support its statement that promissory estoppel claims exist "only"

where the elements of enforceable contract cannot be established does not stand for this

proposition.  Rather, in the referenced case, the Court of Appeals said that "*[g]enerally*, this

doctrine is invoked in situations where the formal requirements of contract formation have not

been satisfied and where justice would be served by enforcing a promise." Carlson v.

Arnot-Ogden Memorial Hosp., 918 F.2d 411, 416 (3d Cir. 1990) (emphasis added).  The second

weakness in defendant's argument is that in Carlson, the Court of Appeals was relying on and

applying Pennsylvanian law rather than New Jersey law.  Defendant does not advance any New

Jersey law that limits the application of promissory estoppel to only situations when the elements

of an enforceable contract are not present.

 Defendant next attacks plaintiff's ability to satisfy the elements of promissory estoppel.

First, defendant maintains that it never promised to be bound by the draw schedule.  Plaintiff

counters that the promise was not that defendant would follow the draw schedule exactly, but

"that it reasonably expected to follow the draw schedule, which meant it was required: (1) to

-17-

NOT FOR PUBLICATION

ensure that the draw schedule represented the manner in which NJTA reasonably expected to draw down funds; and (2) to give effect to the parties' expectation by paying for construction expenses with funds on deposit with SG."  (Pl.'s Br. at 35.)  As defendant does not dispute the fact that in the bid specifications defendant  "expressly represented that it 'reasonably expected' to draw down funds consistent with the draw schedule," (Pl.'s Stmt. of Facts at ¶ 6; Df.'s Resp. to Pl.'s Stmt. at ¶ 6), the Court agrees with plaintiff that there is evidence to support the first element of a promissory estoppel claim.

Second, defendant contends that plaintiff could not have reasonably relied on the draw schedule.  However, as discussed earlier, plaintiff has produced sufficient evidence from which a reasonable jury could conclude that it reasonably relied on the draw schedule.  For these reasons, defendant's motion for summary judgment on the promissory estoppel claim is denied.

**V.**    **Breach of Express or Implied Warranties**

Plaintiff's Fifth Count alleges that "[t]he gross and unreasonable accuracy of the Draw Schedule" amounts to a breach of warranty.  (Compl. at ¶ 43.)  The Sixth Count alleges that "NJTA's inclusion of materially misrepresented and inaccurate Draw Schedule in the Request for Bid constitutes a breach of NJTA's implied warranties in the issuance of the Request for Bids."  (Compl. at ¶ 45.)  Defendant argues that there were no express or implied warranties that it would withdraw funds in accordance with the draw schedule.  It also claims that the plain language of the Agreement, that draws would be "in such amounts as [NJTA] shall request," precludes any express warranty claim.  As noted earlier, however, defendant does not dispute the fact that in the bid specifications it  "expressly represented that it 'reasonably expected' to draw

-18-

NOT FOR PUBLICATION

down funds consistent with the draw schedule."  And plaintiff has submitted evidence from

which a reasonable jury could conclude that defendant breached this warranty.  In light of the

foregoing, defendant's motion for summary judgment on these claims is denied.

**VI.**   **Mutual Mistake of Fact**

Plaintiff's last claim alleges that "[t]he assumption of the parties that NJTA would draw

funds deposited with SG reasonably in accordance with the Draw Schedule constituted a mutual

mistake of fact entitling SG to rescission of the Repurchase Agreement."  (Compl. at ¶ 47.)  As a

general rule, "where parties on entering into a transaction that affects their contractual relations

are both under a mistake regarding a fact assumed by them as the basis on which they entered

into the transaction, it is voidable by either party if enforcement of it would be materially more

onerous to him than it would have been had the fact been as the parties believed it to be."

Beachcomber Coins, Inc. v. Boskett, 400 A.2d 78, 79 (N.J.Super.A.D.  1979) (citing

Restatement, Contracts, § 502 at 961 (1932); 13 Williston on Contracts (3ed. 1970), § 1543,

74-75)).

It appears that defendant is arguing that there was no mistake of fact regarding the

projected draw schedule because it involved a prediction of future events rather than a fact

existing at the time of the contract.  Defendant relies on language from the Restatement (Second)

of Contracts which says: "[T]he erroneous belief must relate to the facts as they exist at the time

of the making of the contract. A party's prediction or judgment as to events to occur in the future,

even if erroneous, is not a 'mistake' as that word is defined here."  § 151. Plaintiff, on the other

hand, argues that the parties' assumption - that the draw schedule was based upon reasonable

-19-

**NOT FOR PUBLICATION**

assumptions - was inaccurate.  It appears plaintiff sees the mistaken fact as whether the draw

schedule was reasonable and that both parties thought it was when they entered into the

Agreement. Defendant views the mistaken fact just as it was alleged - how it would make

withdrawals in the future.

Regardless of whether the mistake was made about the reasonableness of the draw

schedule or if defendant would perform reasonably in accordance with the schedule, neither of

these scenarios will support a mutual mistake of fact claim.  The Restatement (Second) of

Contracts makes clear that predictions about future events, such as how a party will perform in

the future, is not a mistake.  As to plaintiff's view of this claim, it asks the Court to find that

whether the draw schedule was based on reasonable assumptions amounts to a fact in existence

at the time of contract formation.  Whether an assumption is reasonable is a matter of opinion,

unlike a fact which can be easily proved or disproved.  This is unlike a paradigm mutual mistake

of fact case where party A is selling land to party B and both parties believe the land is zoned for

commercial use only and in realty the classification has been changed so the property can only be

used for residential purposes.  For these reasons, defendant's motion for summary judgment on

this claim is granted.

## CONCLUSION

Defendant's motion for summary judgment is DENIED on Counts I through VI and

GRANTED on Count VII.

**s/William H. Walls**
United States District Judge

**NOT FOR PUBLICATION**

**Appearances**

Marvin J. Brauth
Richard J. Byrnes
Robert L. Selvers
Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

Brett A. Schlossberg
Brian T. Feeney
Bryan L. Norton
Greenberg Traurig, LLP
2700 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

Eric S. Aronson
Greenberg Traurig, LLP
200 Campus Drive
P.O. Box 677
Florham Park, NJ 07932